## WITTKOWSKI v. HARRIS et al.

(Circuit Court, W. D. North Carolina. October, 1894.)

1. FACTORS—DEL CREDERE COMMISSIONS.
     The right to a del credere commission exists only when expressly contracted for, and extends only to sales on credit.

2. PLEADING—RELIEF NOT ASKED.
     Under Code N. C., allowing judgment for any relief to which the facts alleged and proved entitle a party, one may sue on an express contract, and recover on an implied obligation.

3. FACTORS—ACCOUNT CURRENT—RENDITION—FAILURE TO OBJECT.
     In an action at law by a factor against his principal, involving accounts of dealings between them, evidence that an account current rendered by plaintiff to defendant had not been objected to within a reasonable time is admissible to show an admission of its correctness, but is to be considered with the circumstances attending their previous dealings, tending to show their feelings and relations with each other.

4. SAME—ADVANCEMENTS—INTEREST.
     Where a factor guaranties his principal the cost of goods consigned to the factor, and at the same time furnishes the principal money to secure

part of such amount, the factor is not entitled to interest thereon, but if there is no guaranty, and the advancement is made as a loan, the factor is entitled to interest,—the amount to be determined by the fact that the proceeds of sale, as received by the factor, should first be applied to necessary expenses and commissions; then to interest and principal of the advancement; any balance of the advancement remaining to bear interest till fully paid.

5. SAME.

Where a factor makes advancements as a loan to his principal in America, on goods to be consigned the factor for sale in Australia, the rate of interest is that allowed at the place where the loan is made, unless it is expressly provided that it be repaid in Australia with the interest there allowed.

6. SAME—CONTRACTS—SOLE AGENCY—MANUFACTURED TOBACCO.

Under a contract by which plaintiff was to be defendant's sole agent in Australia for sale of manufactured tobacco, to be manufactured in a particular manner, he was not entitled to commissions on stemmed leaf tobacco put up in small packages and consigned to another person in Australia, there to be manufactured by the purchasers into cigars and cigarettes.

An action at law to recover a balance of an account current duly rendered, alleged to be due plaintiff, as factor of defendants, for cash advancements and commissions on the sale of certain shipments of manufactured tobacco consigned to him by defendants for sale in the Australian provinces and New Zealand.

L. M. Scott and Dillard & King, for plaintiff.

Mebane & Scott, P. D. Johnston, and James E. Boyd, for defendants.

DICK, District Judge (charging jury). The defendants concede that the paper writing styled "Public Notice" was executed by them, and duly constituted the plaintiff as their sole factor to make sale of their manufactured tobacco in the Australian provinces and New Zealand. If no further express contract had been made by the parties, the law would have implied a contract that the factor should employ reasonable effort, in the market of consignment, to make a fair, honest, and profitable sale of the tobacco, and faithfully and promptly render a full and correct account of his dealings, and remit to defendants net proceeds of sale, after deducting proper expenses, cash advancements, and such commissions as were usually retained by factors for similar services in the markets of sale. Both parties insist that there was a further express contract made by them before the tobacco was manufactured and shipped to Australia, but they very materially differ as to the terms of such contract. As the parties do not agree as to the express terms of their contract, and the evidence is conflicting, you will have to ascertain the terms from the preponderance of the evidence introduced by the respective parties. In order to assist you in performing your difficult and important duty, I will endeavor to give you a brief outline of the contentions and views of the parties, as they appear in the pleadings, the evidence, and the argument of counsel.

The plaintiff insists that the express contract contained the following terms of positive agreement: First. That he was to be the sole factor of the defendants for the sale of their manufactured

tobacco in the Australian provinces and New Zealand, and was to receive, by way of compensation, 5 per cent. commissions on proceeds of sale,—2½ per cent. del credere commissions, and 2½ per cent. for necessary expenditures and cash advancements which might be made to defendants in the course of dealings. Second. That the tobacco was to be manufactured at the lowest possible cost price, and so invoiced to him at the port of consignment; was to be, in quality, manner, and style of manufacture, in conformity with certain furnished samples, under express directions given by him to Alex. Wells, the foreman agreed upon by both parties. The plaintiff fully advised the defendants, and they clearly understood, that no other kind of manufactured tobacco could·be successfully brought into competition with other brands of American tobacco which had already acquired high reputation in the markets of Australia and New Zealand. Third. That the first shipment of tobacco was to be of the amount, kind, and quality as set forth in a written agreement of defendants, drawn up and signed for them by their bookkeeper, Hurdle, and delivered to plaintiff in their presence, and with their approval and consent. It was at that time further agreed that no other shipment was to be made until the plaintiff had tested the Australian markets, and had given express order for further manufacture and shipment; and defendants expressly agreed to sustain all loss that might be incurred by the dangers of the sea,—by incidental damages to tobacco on the voyage, and by failure of successful competition in the markets of Australia after reasonable exertions had been made by plaintiff; and he was only liable for the usual legal responsibilities of an honest and diligent commercial factor, except when he had sold on credit under his del credere commission. Fourth. That at the time when the contract was made there was no agreement for any cash advancements by the plaintiff, but at a subsequent time, when the first lot of tobacco was nearly manufactured for shipment, plaintiff agreed, as a favor to defendants, and at their urgent request, to advance £1,000, and gave them a letter of credit on a bank in London, which enabled them to draw for that amount; and they expressly agreed to pay 10 per cent. interest on such cash advancement, which rate of interest was allowable by the laws of Australia, the place where the money was to be repaid out of the proceeds of the consigned tobacco. Fifth. That he did not order the manufacture and shipment of the second lot of tobacco consigned to him, in Australia, in a few weeks after the first shipment; and he did not authorize the second draft of £1,000 drawn by defendants on the bank in London, as he had no funds in bank to meet such draft, and he would not have honored and paid the same, except upon the earnest and urgent request of defendants contained in the letter introduced in evidence by plaintiff, showing that they knew that they had no authority to draw, and agreeing to pay additional compensation for advancement. Sixth. That the two shipments of tobacco consigned to plaintiff were invoiced at a largely excessive cost price, and were not of the quality, manner, and style of manufacture agreed upon; and, by reason of their excessive invoiced cost price and inferior

quality, they were not suitable to be brought into successful competition with other, cheaper, and better manufactured American tobacco, of long-established brands, which had acquired readiness of sale in the markets of Australia and New Zealand. That plaintiff, in a few days after consignments were received, fully informed the defendants by letter (a copy of which was shown in evidence) that the tobacco was not manufactured in accordance with the terms of their contract, was not suitable for ready and remunerative sale, and that he would hold the same subject to their order, upon repayment of cash advancement and interest. That defendants, in a subsequent letter in reply, requested him to make sale of the tobacco to the best advantage, and save them from as much loss as possible. That plaintiff at once undertook to comply with such request, and made the most careful and diligent efforts, by frequently traveling thousands of miles in trying the various and widely separated markets of Australia and New Zealand. Seventh. That defendants, without the knowledge and consent of plaintiff, and in gross violation of their contract with him, sold or consigned large shipments of manufactured tobacco to other persons in Australia and New Zealand; and he insists that under the terms of said contract he is entitled to recover 5 per cent. commissions on the proceeds of sale realized by defendants from such shipments. Eighth. That, although plaintiff has declared in this action upon a special contract made previous to the manufacture and shipment of the tobacco by defendants, he is still entitled to offer evidence of the acts and correspondence of the parties tending to show subsequent changes and modifications of such contract; and, if the exact terms of the original contract are not fully established to the satisfaction of the jury, he may yet recover judgment for any relief to which the facts alleged and proved entitle him, although not demanded in his prayer for relief.

Defendants' view of the case: The defendants insist, by way of defense and counterclaim: First. That the paper writing offered in evidence by plaintiff, purporting to be signed by them, is no part of their contract, as it was written, under the sole direction and dictation of plaintiff, by their bookkeeper, Hurdle, and was by him signed in their name and delivered without their knowledge and assent, and without any authority vested in him. Second. That the terms of the contract between the plaintiff and defendants were not in writing, but consisted of oral agreements definitely made and mutually understood by the parties. They were made with the view of establishing a continuous trade in tobacco in the Australian provinces and New Zealand for the mutual benefit of the parties, and was to be kept up by frequent consignments of tobacco to the plaintiff, manufactured in accordance with certain directions given by him, as he alone had knowledge of the kinds of tobacco that could be readily and profitably sold in such markets. Third. That the plaintiff carefully examined the large stock of leaf tobacco in the factory of defendants, and said that the material was of very fine quality, and if properly manufactured, in accordance with his directions and the furnished samples, it would be remarkably well suited

to the Australian markets, and would, under his management and sale, net defendants 56 cents per pound; and he agreed to guaranty cost price of 40 cents per pound, which, at his suggestion, had been carefully made, and was expressly agreed upon in the contract. That to secure the proper manufacture of the tobacco the plaintiff went to Richmond, Va., and procured the services of Alex. Wells as manager, and recommended him to defendants as a very intelligent and skillful manufacturer, who had, by long experience, acquired the peculiar knowledge that qualified him to manufacture tobacco suitable for the Australian markets. That defendants employed Mr. Wells as manager at a large salary, and gave him entire charge of the manufacture of the tobacco to be shipped to plaintiff, and, at considerable expenditure, purchased new machinery which he suggested and required. Fourth. That the contract contained no express stipulations as to rate of commissions to be paid plaintiff for negotiating sales, but it was fully understood between the parties that the plaintiff would obtain satisfactory compensation for his services out of the profits that would be realized by him over and above the price which he assured defendants that they would receive from the sale of the tobacco. Fifth. That the tobacco shipped to the plaintiff was manufactured out of the fine quality of leaf tobacco, which had been examined with entire satisfaction by the plaintiff, and was carefully and skillfully manufactured under the direction of Mr. Wells, and was of the quality, manner, and style of the furnished samples. Sixth. That, after the manufacture of the first lot of tobacco for shipment was nearly completed, the plaintiff again visited their factory, and carefully examined the boxes and contents, and said that they were manufactured in accordance with his directions, and were entirely satisfactory, and cordially assured them that they had accomplished in 60 days results that had required Williams 10 years to achieve. That plaintiff was so much pleased with their work that he then voluntarily offered to advance funds to the defendants to enable them to carry out their contract with him, to the amount of the three-fourths guarantied cost price of tobacco, and gave them a letter of credit on a bank in London. Under such letter of credit, they obtained £1,000, as the three-fourths advancement of cost price agreed to be made on the first shipment of tobacco. That, in accordance with the express terms of their contract, they made a second shipment of tobacco, and again drew on the bank in London, and promptly obtained another £1,000,—the three-fourths cost price of the second shipment. Seventh. That defendants made no express contract with the plaintiff to pay him 10 per cent. interest on cash advancements, and they insist that, if they should be held liable for interest on money advanced to insure the payment of the plaintiff's guaranty of cost price, then they are only liable for such rate of interest as is regulated by the laws of this state,—the place where the advancements were made, and where the money was employed by the defendants in carrying out their contract with plaintiff, and where the defendants could only readily recover satisfaction upon the plaintiff's contract to guaranty cost price. Eighth. That both lots of tobacco were

tirily invoiced at cost price, and properly shipped in conformity with contract, were heavily insured for benefit of plaintiff, and reached port of destination in fine condition, and that the failure of ready sale at remunerative prices was caused by the unfaithful and fraudulent management of the plaintiff, and his bad reputation among purchasers and reliable business men in commercial circles.   Ninth. That defendants never sold or consigned any manufactured tobacco to other persons in Australia or New Zealand, but sold and consigned several lots of leaf tobacco to a party in New Zealand, prepared for the purpose of manufacture into cigars and cigarettes, and not for the purpose of immediate sale to consumers.   Tenth. That the plaintiff having declared upon an express contract, and in his subsequent pleadings having relied upon such contract as still existing and unchanged, and having, in his complaint, demanded no other relief, as was allowable at common law in an action of assumpsit, he is not entitled to recover in this action unless he proves such special contract to the satisfaction of the jury.   Eleventh. The defendants insist that in their counterclaim they are entitled to recover the cost price of the tobacco manufactured and shipped to plaintiff under the express contract of guaranty made by him as an inducement to such manufacture and shipment, and also for damages sustained by them by reason of loss of profits on the sale of the tobacco, occasioned by the unfaithful and fraudulent conduct of plaintiff in the management of their business in a foreign and distant market.

Gentlemen of the jury, the court has presented to you a brief but sufficient statement of the views and contentions of the parties to this action.   You must carefully consider and determine the merits of this controversy from a preponderance of the conflicting evidence. To enable you to do so correctly, certain issues of fact have been prepared by counsel of both parties, with the approval of the court, which present in direct and intelligible form the questions of dispute involved.   To guide you in your deliberations, I will now state some rules of evidence and modes of procedure which have been devised and observed by courts of justice in ascertaining the terms of unwritten contracts when the evidence of the respective parties is in conflict:

First. You must determine the credibility and weight of the evidence by carefully considering the proved general character of the witnesses, the manner in which they have testified, their personal interest in the result of the controversy, and the motives by which they may have been influenced.

Second. You must inquire into the purposes of the parties in making the contract, the relation intended to be established between them, and the benefits which they respectively expected to realize. In doing so, you may consider the circumstances surrounding the transaction calculated to throw light upon the subject, and show the intentions of the parties.   On this point, I will briefly call to your attention the general scope of the evidence offered by the parties. The evidence of the plaintiff tends to show that he had resided in Australia 44 years as a commission merchant engaged in the sale of tobacco, and during that period had often visited America for the

purpose of obtaining consignments of tobacco for sale on commission, and had procured numerous consignments from manufacturers in Richmond and Petersburgh, Va.; that he had been agent for the sale of Williams' brands of tobacco, which had acquired considerable popularity in Australian markets, and such agency had been discontinued; that in the spring of 1888 he came to Richmond, Va., for the purpose of securing the manufacture and consignment of new brands of tobacco, with which he could successfully compete with the Williams brands; that he had no intention of going to Reidsville, N. C., until the defendants sought him in Richmond, and induced him to visit their factory to examine their leaf stock, and their methods and facilities of manufacture; that he fully advised defendants that tobacco of a certain quality, manufactured into plugs which could be properly cut off for smoking, was the only kind suitable and readily salable in Australia, as the people principally used tobacco for smoking; that he examined the defendants' stock of leaf tobacco, was pleased with its quality, furnished samples, and gave full direction as to the manner of manufacture, and secured them the services of Alex, Wells as manager, whom he believed, from former experience, to be fully qualified for the objects contemplated; that he informed defendants of the difficulties and risks of bringing new brands of tobacco into competition in the markets with old and well-established brands; that defendants were very anxious to make a venture in the Australian markets, with a view of obtaining a lucrative trade in future, resulting in large profits, and they expressed entire willingness to incur all the difficulties and risks of a first experiment; that defendants readily agreed to pay him, by way of compensation, 5 per cent. commissions on sales,—$2\frac{1}{2}$ per cent. del credere commissions, and $2\frac{1}{2}$ per cent. on any cash advancements; that after the first lot of tobacco was manufactured he loaned £1,000 to defendants, at their urgent request, and they expressly agreed to pay him 10 per cent. interest on such advancement until repayment was made.

The evidence of defendants tends to show a state of facts and circumstances, in most respects, different from the evidence of the plaintiff: That plaintiff examined and was fully satisfied with the tobacco after it was manufactured from the stock of leaf tobacco which he had previously seen and approved, which had been manufactured in conformity with his furnished samples by a skillful manager of his own selection, and he assured defendants that tobacco would net them 56 cents per pound in the markets, and expressly guarantied the payment of cost price of manufacture, and voluntarily offered to advance three-fourths of such guarantied cost price, and gave them a letter of credit on a bank in London, by which they were enabled to obtain £2,000,—the three-fourths cost price of the tobacco manufactured and shipped by them to plaintiff in Australia; that no stipulation was required or made as to commissions on proceeds of sale, or as to interest on cash advancements, and at request of plaintiff the tobacco on shipment was largely insured by defendants for his benefit.

The evidence which I have briefly recapitulated tends to show

the terms of the first contract made by the parties. There was other evidence upon the same points, which you probably recollect and will fully consider, and you must not regard as unimportant because I have not called the same to your special attention. I have only attempted to give the general scope of the evidence. You should also consider the subsequent acts and correspondence of the parties as proper evidence to enlighten your minds as to the construction and interpretation put upon the original contract by the parties, and as to the changes and modifications subsequently made by them as variations in substitution of some of the terms of their first contract. You should also consider the probability and reasonableness of the terms of the contract as respectively contended for by the parties, in the light of all the circumstances that appear in evidence as to their objects and business relations and transactions. The contract, as contended for by the plaintiff is, in most respects, similar to those implied by law, or usually made in commercial transactions between principal and factor when goods and merchandise are consigned for sale in home or foreign markets. If you find the terms of the contract as contended for by defendants, then the plaintiff, by his express guaranty, assumed the responsibility of a purchaser, to the extent of the cost price of manufacture, the expenses of shipment, and the dangers and damages of the voyage. If plaintiff guarantied that defendants should realize 40 cents per pound on the tobacco, they were entitled to such amount as soon as the tobacco was manufactured and delivered to the common carrier to be transported to the place of consignment; and such sum could not be diminished by subsequent expenses, damages, and failure of remunerative sale in the Australian markets. If such were the terms of the contract, the defendants were very fortunate and skillful in negotiating an arrangement with an old and experienced factor, by which they could make a first venture in finding a new and desirable foreign market. They were safe as to cost price of material and manufacture, secured by cash advancements; and they incurred no liabilities for commissions or interest on advancements, and no risk, except as to profits over and above cost price.

Gentlemen of the jury, I will now give you instructions upon some legal questions which have been ably discussed by counsel during the progress of this long, extended trial. I have already instructed you as to the nature of the contract which the law implies between principal and factor when the parties have not made an express contract embracing all the terms of their agreement, on entering into such relations with each other.

In this place I deem it proper to explain to you the nature of a del credere contract of agency, as such contracts have not been much considered in the courts of this state. A del credere factor is one who, in consideration of a higher compensation, expressly engages to pay to his principal the price of all goods sold by himself, if the purchaser fails to do so. This obligation always arises under an express contract, and is not implied by law. If the goods are sold for cash, and he receives the purchase money, he is not

entitled to del credere commissions, as he incurred no personal liability of payment to his principal, and the del credere contract was without consideration as to such cash payments.

The counsel of defendants insisted that the plaintiff having declared on an express contract, and without asking relief upon any implied promise or obligation, he cannot recover unless he has proved to the satisfaction of the jury the special cause of action stated in his complaint. This strict rule of common-law pleading has been abolished by the code system adopted in this state, and the new and more liberal rule of pleading has been established, "that a party may recover judgment for any relief to which the facts alleged and proved entitle him, although not demanded in his complaint."

The plaintiff introduced evidence tending to 'show that he completed the sales of all tobacco consigned to him in May, 1891, and he promptly advised defendants of his action; and in March, 1892, —10 months afterwards,—he sent them by mail an account current, showing a balance due him, and received no reply making objections. The plaintiff, in his personal testimony, gave reasons for his long delay in sending his account current after his letter advising defendants of the closing sales of their tobacco in May, 1891. There is much evidence tending to show that the previous dealings between the parties had not been harmonious and satisfactory, but far otherwise. The counsel of plaintiff now insist that the account current so rendered without objection should have the force and effect of a stated account. Courts of equity, in adjusting mutual dealings between merchants, established the rule that the rendition of an account, and its retention by the party to whom sent without objection within a reasonable time, should have the force and effect of a stated account, and be presumed correct until the contrary is clearly made to appear. This rule is also applied in equity in adjusting account of a factor with his principal, upon the ground that such business relation is of a confidential character, and it is the legal duty of an agent to render prompt and correct account of his dealings, and the conduct of the principal is generally construed liberally in favor of the agent. A principal who is promptly advised of acts done by his agent must give notice of dissent within reasonable time, or his silence will give rise to a presumption that the agent's reported acts are assented to and ratified. Such presumption may be fully rebutted by evidence that the previous dealings between the parties had not been confidential, harmonious, and satisfactory, and that the agent had control of the property of the principal, who had no means, of adequate relief as to wrongful acts of his unfaithful and dishonest agent in a distant and foreign market. In trials at law involving accounts of dealings between parties other than merchants, the rule applicable to most cases is that where an account current has been rendered by one party, and no objection has been made by the other within a reasonable time, evidence of such fact is admissible to show an implied admission of and acquiescence in its correctness, to be considered by a jury under all the circumstances attending the

previous dealings between the parties tending to show their feelings and relations with each other.

The defendants admit that they obtained £2,000 from plaintiff, but they insist that such money was received by them as a partial payment under the plaintiff's agreement to guaranty the cost price of the manufactured tobacco consigned to him. If you should find that the plaintiff guarantied the cost price of the tobacco, and such cash advancements to secure the payment of the three-fourths amount of cost price to induce shipment, then he is not entitled to recover interest, for when the tobacco was shipped and consigned to him the defendants could properly apply the money received by them in partial payment of the guarantied cost price. Such payment cannot be regarded as advancements made by a factor, to be accounted for, with interest, on final settlement of the dealings of the parties. If you should find that such advancements of money were made as a loan to the defendants, to be repaid by proceeds of the consigned tobacco, and be accounted for in the future dealings of the parties, then plaintiff was entitled to interest until he received payment of this loan from proceeds of sale of tobacco. The proceeds of sale, when received from time to time by plaintiff, should have been applied in his accounts current, first in payment of his necessary expenses and commissions, and then to the interest and principal of the cash advancements; and, if insufficient for full payment, he would be entitled to interest on any balance that might remain until the loan was fully discharged.

The plaintiff is not entitled to recover the amount of interest which he claims unless you find that the contract of loan expressly stipulated that the borrowed money was to be repaid in Australia at 10 per cent.,—the rate of interest allowable by the laws of that country. When there is no express contract for the payment of interest, the legal obligation of a contract of loan is repayment of the money at the place where borrowed, at the rate of interest which the local law allows, as an incident to the debt; and if the money is not repaid the creditor is entitled, in an action at law, to recover his debt, with such interest assessed as damages for the detention of the money. Interest is not strictly a part of a contract of loan, unless expressly stipulated for in the terms of the contract. In every forum a contract is governed by the law with a view to which it was made. Contracts made in one place, to be performed in another, are to be governed by the laws of the place of performance; and, if such laws allow a higher rate of interest than those of the place of the execution of the contract, the parties may expressly stipulate for such higher rate of interest, and the contract will be valid and obligatory.

The plaintiff claims that under his contract with defendants he was to be their sole agent for the sale of manufactured tobacco in the Australian provinces and New Zealand, and that he is entitled to recover 5 per cent. commissions on the proceeds of tobacco which the defendants admit that they sold and consigned to a party in New Zealand. The evidence tends to show that such tobacco was stem-

med and put up in packages of 12 or 15 pounds weight, and was not prepared for sale in the market to consumers as manufactured tobacco, but was intended to be manufactured by the purchasers into cigars and cigarettes. Under our strict internal revenue laws, the defendants might be regarded as manufacturers of such tobacco, and held liable to pay special taxes; but I think that, under a fair construction of their contract, they are not liable to plaintiff for commissions if the tobacco put up by them, and sent to New Zealand, was prepared and intended for sale to manufacturers of cigars and cigarettes, and not to immediate consumers. The parties to this action made a contract about tobacco of a particular quality, to be manufactured in a manner and style suitable to the Australian market, and in conformity with certain furnished samples. The reasonable object of their contract, in reference to other commission merchants, was to prevent defendants from selling similar manufactured tobacco to consumers, or making consignments to other commission merchants who would be competitors of plaintiff in the markets of Australia and New Zealand.

Gentlemen of the jury, if a preponderance of the evidence satisfies you that the contract and dealings of the parties were as alleged by the plaintiff in his pleadings, and supported by his personal testimony and the voluminous correspondence with the defendants, then, in your adjustment of the matter, he is entitled to 5 per cent. commissions on the proceeds of sale of tobacco, 2½ per cent. commissions on del credere sales, 2½ per cent. on money advanced by him for necessary expenditures as factor, and also to the payment of any balance that may be due him on the £2,000 advanced as a loan to defendants, with 10 per cent. interest on same, after deducting, at the time when received, the proceeds of sales of tobacco consigned to him by defendant. If a preponderance of the evidence satisfies you that the contract and dealings of the parties were as alleged by defendants in their answer and counterclaim, supported by their personal testimony, the testimony of many other witnesses, and the written correspondence with plaintiff, then, in your adjustment of the controversy, they are entitled to recover on their counterclaim the balance of the guarantied cost price of the tobacco consigned to plaintiff, and the expenses of shipment, after deducting the £2,000 advanced them, without interest, as the money was a partial payment of the guarantied cost price. The defendants are not liable for commissions on sales, as the evidence shows that the guarantied cost price and expenses of shipment have not been realized by them.

Gentlemen of the jury, I have now performed my part in this trial as fairly and justly as I could, and I feel confident that you will patiently and honestly endeavor to render a verdict in accordance with the weight of the evidence, and in compliance with the legal instructions given by the court.